IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

DALE HENDERSON,

        Petitioner,

      v.                    CASE NO. 11-3007-SAC

STEVEN SIX,
Attorney General of
the State of Kansas,

        Respondent.[1]

## MEMORANDUM AND ORDER

This case comes before the Court on a petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 by a Kansas prisoner. Mr. Henderson claims that his trial counsel was ineffective for introducing at trial the hearsay statement of a co-perpetrator "that infringed on right of confrontation." The state courts found that Mr. Henderson failed to show constitutionally deficient performance on the part of his trial counsel as well as prejudice. This court concludes that petitioner has not met his burden of showing that the state court findings were objectively unreasonable. Accordingly, the federal petition is denied.

## I. PROCEDURAL HISTORY

---

1    Upon respondent's apt suggestion, the clerk is directed to substitute Rex Pryor, Warden, Lansing Correctional Facility, as sole respondent.

1

Mr. Henderson was convicted by a jury in the District Court of Shawnee County, Kansas, of aggravated robbery, aggravated burglary, criminal possession of a firearm, and criminal restraint.  In April 2004, he was sentenced to 216 months in prison.  He directly appealed to the Kansas Court of Appeals (KCA) claiming insufficient evidence. The KCA affirmed; and his Petition for Review was denied by the Kansas Supreme Court (KSC).  *See State v. Henderson*, 133 P.3d 841, 2006 WL 1318808 (Kan.App. May 12, 2006).

In 2007 Mr. Henderson filed a motion for post-conviction relief pursuant to K.S.A. § 60-1507 claiming ineffective assistance of trial counsel and violation of his right to confrontation.  The district court summarily denied the motion.  Mr. Henderson appealed to the KCA, which affirmed in 2010.  His Petition for Review was denied the same year.

Petitioner timely filed this federal application for habeas corpus relief.  Respondent has filed his Answer and Return together with the state court records.  Petitioner did not file a Traverse. The court has considered all materials in the file and conducted its own review of the state court records.

## II. FACTUAL BACKGROUND

On April 14, 2002, D. Nash (D) was robbed and burglarized in her home.  Around the same time, neighbors alerted authorities to

a suspicious vehicle in the neighborhood, and a police officer made contact with Meghan Brandenburgh (hereinafter sometimes referred to as MB) who was waiting in the vehicle. The officer witnessed three men running toward the vehicle, and ordered them to stop. Two of them fled; while the third, Daniel Zapata, stopped and was arrested. Additional background facts and evidence presented at trial were detailed by the KCA in its opinion on petitioner's collateral appeal in *Henderson v. State,* 223 P.3d 838, *1, 2010 WL 653144 (Kan.App. Feb. 19, 2010):

> As officers combed the area in the direction of the fleeing assailants, they saw Henderson running and arrested him. Henderson was sweating profusely and breathing heavily. Officers took Henderson back to the scene where Brandenburgh identified him as one of the men fleeing the scene. Before his arrest, Henderson was seen running through a car wash. Officers found a dark blue sweatshirt in a trash dumpster at the car wash. The sweatshirt later tested positive with Henderson's DNA. On the trail allegedly taken by the perpetrators, a police dog alerted to the computer bag taken from Nash's residence, a blue and white bandana, and a silver handgun.

> Nash identified Brandenburgh as the person who had knocked on her door before the perpetrators pushed through. However, Nash could not identify Zapata by face, but stated his complexion and clothing were similar. Nash said that she could not identify Henderson as one of the assailants but that he looked similar to one of the men except he was wearing different clothing. Nash stated one of the men had a blue bandana over his face and wielded a silver handgun.

> At the police station, Detective Stephen King of the Topeka Police Department interviewed Zapata. Zapata denied

being involved in the robbery. While Zapata was alone in the interview room, he muttered the phrase, "she's tellin' on us now, dog." The issues raised in Henderson's 60-1507 motion concern admission of this statement at trial[.]

*Id.* The KCA quoted the objection from the trial transcript and the ensuing discussion among the judge and counsel:

Q. [MR. SHEPHERD]: And then after you left the room Damian made a statement, didn't he?
A. [DETECTIVE KING]: I believe there was a statement picked up on tape.

Q. Uh-huh. And that statement was?

MR. McELHINNEY [PROSECUTOR]: I'm going to object as hearsay.

MR. SHEPHERD: Can I approach?

THE COURT: Sustained. You may.

(At the bench with the Court and counsel out of the hearing of the jury:)

THE COURT: Before you go any further, let me just sort of give you a warning. You've opened the door for the State to put on Damian Zapata's statement and you're concerned about your ability to cross-examine him. You've invited the State to go into an area that I thought you were trying to protect.

MR. SHEPHERD: Well, I'm going into an area that just—that he made an incriminating statement.

THE COURT: But once you open the door the State is going to bring that statement out. Is that what you were intending?

MR. SHEPHERD: Well, actually it's not the same statement, but—yes and that's fine. This statement, though, is what he made on the videotape, the incriminating statement. He made an incriminating statement and there's two basis for

it to overcome or two exceptions to hearsay.  One is the statement against interest, and two, it's a confession.

THE COURT: But the protection, though, was to—Mr. Shepherd, in that once you open the door, Mr. McElhinney's going to be able to use those statements and you don't have Mr. Zapata here to cross-examine.

MR. SHEPHERD: I want them to hear the statement. . . .

MR. SHEPHERD: I don't represent Mr. Zapata.

THE COURT: And that's why I'm telling you I wanted to make sure you've thought carefully about once you open this door.  I trust or I suspect the State is going to want to come back and make some questions about the Zapata statement and it's fair game.

MR. SHEPHERD: That's fair. . . .

THE COURT: Well, it may be a bunch of nothing when it all comes down to it, but the defendant has indicated he wants to go into that area and you objecting, I'm going to go ahead and overrule the objection and allow that, the inquiry.  But you know, I'm just suggesting that maybe you're opening the door and I don't know what Mr. McElhinney may want to do . . . .

MR. SHEPHERD: The statement is that—and you can actually see it on the video, if you'd like to dismiss the jury and just see the video, but he comes to the window and says, oh, she's telling on us. That's what he says.

THE COURT: She's telling on us.  That's not really helpful to the case.

MR. SHEPHERD: He makes a statement that he was there, that he was more than just somebody that was sitting there who was just happened to be in the area.

THE COURT: Well, you know—Okay, you're saying that you want to put that on. That, she's telling on us. I'll allow you to do that. Is the—it's a statement against interest, but it's a statement against your client's interest also.

5

MR. SHEPHERD: Maybe, maybe not. He didn't specify who us was.

THE COURT: Well, that can be argued by all of you, but I'll allow the question. . . .

. . .THE COURT:  Just wanted to make sure that from the defendant's perspective I don't think it's very helpful and I think you're running somewhat of a risk in this area, but if you want to—

MR. SHEPHERD: It's not a risk to my client. . . .

*Id.* at *1-*3.  Defense counsel Shepherd then asked the following questions of Detective King on cross-examination in the presence of the jury.

Q. (By Mr. Shepherd) Again, my question was, that Mr. Zapata, after you left the room, made a statement while he was alone in the interview room, correct?

A. (By Detective King) Correct.

Q. Mr. Henderson, wasn't there with him?
A. No.

Q. You never interviewed him with Mr. Henderson, did you?

A. No.

Q. And Mr. Henderson—he never said that Mr. Henderson was involved in the—in the robbery, did he?

A. No.

Q. And he made a statement and the statement that he made after you left the room was what?

A. She's telling on us, dog.

*Id*. at *3.  The KCA then described how this statement was used during the remainder of the trial: the State did not cross-examine Detective

King on the statement in redirect nor did it rely on the statement in closing argument.  The only other mention of the statement was by defense counsel midway through his closing argument:

> What does he [Zapata] say when he's being questioned that night, April 14th, 2002?  He's alone or he thinks he's alone in the interrogation room. Detective King walks out and he says, 'She's telling on us, dog.'  That's what he said.  And Damian doesn't have anything to do with this?

*Id.* at *2-*3.  These facts are not challenged by the parties and are adopted by this court.


III.  **STANDARD FOR FEDERAL HABEAS CORPUS REVIEW**

A federal court's habeas corpus review of a state criminal conviction is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  The federal court does not sit as a super-state appellate court.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  AEDPA imposes a "highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt."  *Renico v. Lett*, 559 U.S. 766, 773 (2010).  Under AEDPA, where the merits of a state prisoner's claims were addressed in the state courts, a federal court may grant relief only if it determines that the state court proceedings resulted in a decision (1) "that was contrary to, or involved an unreasonable application of, clearly established Federal

law, as determined by the Supreme Court of the United States;" or (2) "that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Welch v. Workman*, 639 F.3d 980, 991 (10th Cir. 2011). The Tenth Circuit has further explained the review standard as follows:

> Under the "contrary to" clause, we grant relief only if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, relief is provided only if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case. *Gipson v. Jordan*, 376 F.3d 1193, 1196 (10th Cir. 2004)(quotations, alterations, and footnote omitted). As these standards make clear, "[w]hen reviewing a state court's application of federal law, we are precluded from issuing the writ simply because we conclude in our independent judgment that the state court applied the law erroneously or incorrectly." *McLuckie v. Abbott*, 337 F.3d 1193, 1197 (10th Cir. 2003). "Rather, we must be convinced that the application was also objectively unreasonable." *Id.*

*Hooks v. Workman*, 606 F.3d 715, 721 (10th Cir. 2010). "[A] decision is 'objectively unreasonable' when most reasonable jurists exercising their independent judgment would conclude the state court misapplied Supreme Court law." *Maynard v. Boone*, 468 F.3d 665, 671 (10th Cir. 2006).

Even where constitutional error is established, the federal habeas court's inquiry is limited to whether "the prejudicial impact of constitutional error in [the] state-court criminal trial" rises to the "substantial and injurious effect standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993)", and *O'Neal v. McAninch*, 513 U.S. 432 (1995). *Fry v. Pliler*, 551 U.S. 112, 120, 121 n. 3 (2007). "Under *O'Neal*, a 'substantial and injurious effect' exists when the court finds itself in 'grave doubt' about the effect of the error on the jury's verdict." *Welch v. Workman*, 639 F.3d 980, 992 (10th Cir. 2011)(*citing O'Neal*, 513 U.S. at 435). On the other hand, "when a court is 'in virtual equipoise as to the harmlessness of the error' under the *Brecht* standard, the court should 'treat the error . . . as if it affected the verdict. . . .'" *Fry*, 551 U.S. at 121 n. 3 (*quoting O'Neal*, 513 U.S. at 435).

Finally, pursuant to § 2254(e)(1), the court must presume that the state court's factual determinations are correct, and petitioner bears the burden of rebutting the presumption by clear and convincing evidence.

## IV. CLAIM

In his federal petition, Mr. Henderson presents his claim as a single ground: "Trial counsel ineffective for introducing prejudicial hearsay statements that infringed on right of

confrontation." He alleges no supporting facts in his petition, but merely states that the "facts are mostly set forth in Attachment A." Attachment A is a copy of the opinion of the KCA in Henderson's case on collateral appeal, which is extensively quoted herein. Attaching this opinion did not satisfy petitioner's burden of alleging supporting facts in his federal petition.

Nevertheless, the court has considered petitioner's claim as it was presented to the state courts. Petitioner first raised this claim in his state post-conviction motion filed pursuant to K.S.A. 60-1507. The KCA summarized his claim in that motion as:

> . . . his counsel was ineffective for introducing and/or failing to object to the admission of hearsay statements of Zapata and that he had been denied his right of confrontation under the Sixth Amendment to the United States Constitution by admission of those statements without a formal waiver of his constitutional right.

*Id.* at *4. The KCA summarized Henderson's argument on collateral appeal as: "the district court erred in denying his claim of ineffective assistance of counsel because Zapata's statement at the station was clearly hearsay, it undermined the confidence of the trial, and defense counsel failed to obtain a waiver of Henderson's right of confrontation before eliciting Zapata's statement."[2] *Id.*

---

2    In his appellate brief, Henderson described the "specific allegation" as: trial counsel was ineffective by cross-examining Detective King to elicit statements made by a witness-suspect by the name of Zapata. Brief of Appellant, App.Case No. 09-102009 at 3 (filed Sept. 21, 2009). It was argued that trial counsel was ineffective for two reasons: he unreasonably put Zapata's statement

## V. DISCUSSION

### A. Ineffective Assistance of Counsel Claim

#### 1. State Decision

This claim was decided on the merits by the KCA.  That court expressly applied existing Supreme Court precedent:

> The defendant must "establish the two essential elements of ineffective assistance of counsel enunciated in *Strickland v. Washington* . . . .  Those elements, as recognized by this court, are: (1) counsel's representation fell below an objective standard of reasonableness, considering all the circumstances and (2) but for counsel's deficient performance there is a reasonable probability that the outcome of the proceeding would have been more favorable to the defendant. . . .  In considering the first element, [Henderson's] trial and appellate counsel enjoy a strong presumption that their conduct falls within the wide range of reasonable professional conduct.  Thus, we are highly deferential in scrutinizing their conduct and make every effort to eliminate the distorting effects of hindsight." *Moncla v. State*, 285 Kan. 826, 831-32, 176 P.3d 954 (2008).
>
> . . . . [Henderson] bears the burden of demonstrating that trial counsel's alleged deficiencies were not the result of strategy.  *Ferguson v. State*, 276 Kan. 428, 446, 78 P.3d 40 (2003)." *State v. Gleason*, 277 Kan. 624, 644, 88 P.3d 218 (2004).

*Henderson*, 223 P.3d 838, at *4.

---

into evidence and waived Henderson's right to confront Zapata, and failed to follow state law by not requiring Henderson's personal waiver. *Id.* at 11.  A federal habeas corpus court does not sit to correct errors of state law. *Estelle*, 502 U.S. at 67-68.

The KCA upheld the state district court's denial of Mr. Henderson's 60-1507 motion reasoning as follows:

> We agree with the district court's conclusion regarding defense counsel's strategic decision to introduce Zapata's statement. We give wide latitude to trial counsel in determining and executing matters of trial strategy. *Gleason*, 277 Kan. at 644, 88 P.3d 218. It is clear that defense counsel was using the statement in an attempt to discredit Zapata as a witness and his claim that he had no involvement in the crime. Defense counsel's theory was that the statement showed Zapata was more than somebody who just happened to be in the area at the time of the robbery. The district court found the "defense hoped this evidence would undermine Brandenburgh's testimony about Henderson's participation in the robbery."

*Id*. at *5. The KCA concluded that the "admission of Zapata's statement, while not causing a defense verdict, was trial strategy." *Id*. at *6; *see Bullock v. Carver*, 297 F.3d 1036, 1053-54 (10th Cir. 2002) (A fully informed attorney could have concluded that admitting the hearsay statements was to defendant's strategic advantage.).

With regard to the prejudice element in particular, the KCA reasoned as follows:

> The critical fact in this case is prejudice, or lack thereof. This is probably because there is none. Henderson does not address the prejudice requirement on appeal. The crux of the district court's admonition to defense counsel was that prejudice might result because the statement would open the door for the State to cross-examine Zapata as to the statement. However, at trial, the State did not address this statement on redirect after it had been introduced by defense counsel during cross-examination. There was never any inquiry by either defense counsel or

the State as to who "us" was in Zapata's statement.  The
only other reference to this statement was defense
counsel's argument in closing that the statement showed
Zapata participated in the crime and his statements should
not be believed.

*Id.* at *5.  In addition, the KCA quoted "the overwhelming direct and

circumstantial evidence of Henderson's participation" found by the

court on petitioner's direct appeal:

[T]he victim's testimony about the timing of the robbery
and the vague physical description she was able to provide
coincided with the testimony of witnesses to other events.
The victim was able to positively identify Meghan
Brandenburgh, who was with the perpetrators when they
entered her home.  Meghan was later apprehended by an
officer investigating a suspicious vehicle call, and she
told the officer that she was waiting for 3 friends to return
. . . .  The witnesses who reported the suspicious vehicle
told the officer that three African-American men had exited
the vehicle sometime earlier.  The car belonged to the
defendant and his wife.  The officer investigating the call
then witnessed three African-American men climbing over a
chain link fence, coming from the direction of the victim's
house.

"Two of the three men ran.  One of these men was tracked
. . . east to a privacy fence just on the other side of
the car wash on California.  Along the trail, the canine
officer discovered the computer bag taken from the
victim's residence, a blue and white bandana consistent
with the description of an article of clothing worn by one
of the perpetrators, and a silver-colored handgun.
Another officer had earlier seen the defendant run from
the car wash across the street to a service station.  A
dark-colored sweatshirt, which possessed DNA consistent
with the defendant's, was recovered from a trash container
at the car wash.  When the defendant was arrested, he was
sweating profusely and breathing heavily.

13

"Finally, the State introduced the testimony of Meghan Brandenburgh, who testified the defendant was one of the perpetrators of the robbery. *State v. Henderson*, No. 93,184 (133 P.3d 841, at *1)

*Id. at *5-*6.* The KCA expressed confidence based on this evidence that "the result of the trial would not have been any different had Zapata's statement not come into evidence." *Id.* at *5.


### 2. *Federal habeas review*

The Sixth Amendment guarantees criminal defendants the right of effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668 (1984). Recently, the Tenth Circuit succinctly summarized the *Strickland* standard:

A petitioner claiming ineffective assistance of counsel must demonstrate "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*[, 466 U.S. 668 at 687]. In applying this standard, "we give considerable deference to an attorney's strategic decisions and recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Bullock v. Carver*, 297 F.3d 1036, 1044 (10th Cir. 2002)(quotation omitted).

*Schreibvogel v. Wyoming Dept. of Corrections State Warden*, ___ Fed.Appx.___, 2013 WL 6487356, *1 (10th Cir. Dec. 11, 2013)(unpublished). Petitioner bears the burden of proving both

deficient performance and prejudice. *Id.* It is likewise petitioner's burden to overcome the presumption of effective representation "by showing that the alleged errors were not sound strategy." *Strickland*, 466 U.S. at 689. Moreover, when § 2254(d) applies "in tandem" with the *Strickland* standard, the question is not whether counsel's actions were reasonable, but "whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." *Harrington v. Richter,* ___ U.S.___, 131 S.Ct. 770, 788 (2011).

The state court's findings that counsel's performance was not deficient and amounted to trial strategy are in accord with, rather than contrary to, *Strickland*. Moreover, these findings are amply supported by the record, which plainly shows that petitioner's defense attorney deliberately introduced Zapata's hearsay statement during cross-examination of Detective King. Counsel explained in response to the State's objection and the court's inquiry that his intention was to elicit evidence that Zapata, the one man actually arrested at the scene of the crimes, had also made a self-incriminatory statement. Counsel believed that the statement supported the defense position that Zapata, not Henderson, was the shorter of the two perpetrators that entered the home and committed the crimes. Defense counsel referred to the statement in his closing argument but only in a manner intended to support the defense.

Defense counsel explained on the record that he believed the statement could benefit his client by showing that Zapata was not an innocent bystander and would not incriminate his client because Zapata had not identified who he was referring to as "us."  Thus the record contains defense counsel's own explications that introduction of Zapata's statement was his strategic decision to draw suspicion to Zapata and away from Henderson.[3]

Respondent and the KCA noted that defendant Henderson did not even address the prejudice element on appeal, and no facts are alleged in his federal petition.  Petitioner's claim of ineffective assistance of counsel might have been denied based solely on his failure to allege any facts showing prejudice.  It is petitioner's burden to show a reasonable probability that the verdict would have been different without Zapata's statement.  *Strickland*, 466 U.S. at

---

[3]    The record further reflects that defense counsel's overall performance was not constitutionally inadequate.  Counsel also argued there was insufficient evidence that Henderson entered the house or committed any of the crimes.  In support of this position, he elicited through cross-examination that MB had given two untrue statements to police and initially named a man other than either Henderson or Zapata as the shorter perpetrator.  However, MB testified at trial that Henderson's sister and mother had threatened her and told her to implicate the other man.  Defense counsel then argued that any statements or testimony implicating Henderson by either MB or Zapata were suspect as both appeared culpable and had escaped prosecution by implicating Henderson.  Counsel further challenged MB's credibility by noting that she had previously cashed a couple "illegal checks" for J Nash, had stated that she intended to get money from J that night, and had received immunity regarding the bad checks in exchange for her testimony.  In addition, counsel suggested that MB was serious about Henderson and mad when she found out he was married.  He also brought out that other DNA not belonging to Henderson was found on the blue sweatshirt and that no DNA or fingerprints placed Henderson inside the victim's home.

694. Nevertheless, this court has undertaken its own review of the transcripts and other state court records. The testimony included that on the night of the crimes, 17-year-old Meghan Brandenburgh and two males she did not know were picked up and driven by Mr. Henderson in his vehicle to the neighborhood where J Nash and his wife D lived. The crimes committed that night were described mainly through the testimony of MB and the victim D. Henderson parked his car near a house across an alley behind the Nash residence, and the four occupants walked to the Nash's front door. MB knocked and asked for J Nash. After D said that he was not home, MB asked to use the telephone. D cracked open the door believing only MB was there. Two men then forced their way into the house with MB. MB then returned to the car. Thus, the eyewitness testimony of MB placed Mr. Henderson at the scene and inside the Nash house during the crimes. MB had dated Henderson so there was no question that she could identify him. The victim identified MB and testified that the crimes were committed by the two men who entered her house with MB. The victim described and identified clothing worn by the two males who had pointed guns at her, demanded money, tied her up, ransacked the house, and stole cash and a couple other items. D could not identify the two men by facial features, but described them as black males both wearing dark blue or navy hooded sweat shirts, and both having entered the house with guns drawn. D described the guns as one or

both being silver.  One man was tall, and the shorter wore a blue bandana covering part of his face.  In the meantime, the neighbor called police, and an officer arrived to find MB sitting in Henderson's car.  While the officer was talking to MB, three men came running toward the car.  When the officer ordered them to freeze, the only man to stop was wearing a gray sweatshirt and turned out to be Zapata.  The other two men were seen running south.  MB identified the three men as those with whom she had arrived.  Thus, there was eyewitness evidence at trial that Henderson was one of the two men that fled.  Other police officers immediately began a search for the two suspects.  Mr. Henderson was spotted running by a car wash not far from the scene and observed as he crossed the street to a gas station where he was arrested.  Henderson was not wearing a hooded sweatshirt or a bandana.  However, a quick search with a police dog turned up a blue bandana and a silver handgun along the route between the car wash and the scene and a blue hooded sweat shirt was found on top in a trash container at the car wash.  DNA on the hooded sweatshirt matched that of Mr. Henderson.  This circumstantial and scientific evidence presented at trial supported the eyewitness testimony that Mr. Henderson was one of the two male perpetrators in the Nash home[4] and the state's theory that he was the

---

4    The identity of the tall male who entered the Nash house that night was not discussed at Henderson's trial, but at sentencing and other proceedings it was

shorter perpetrator wearing the blue bandana.  The record fully supports the state court's finding that the prosecution presented overwhelming evidence of Mr. Henderson's guilt other than Zapata's statement.  This court thus agrees with the state court that there was no probability that the result of petitioner's trial would have been different had petitioner's defense counsel not elicited Zapata's statement.[5]

### B. Denial of Right to Confrontation Claim

#### 1. State Decision

The KCA also denied petitioner's underlying claim on the merits that his right to confrontation was violated by introduction of Zapata's statement.  They acknowledged the defendant's right to effective cross-examination of witnesses under the Confrontation

---

said to be Henderson's uncle, Floyd Allen.  The prosecutor did not charge Allen, citing tainted photo identifications conducted by Zapata's attorney.  It was also revealed in a bench conference that charges were dismissed against Zapata after MB testified at the preliminary hearing that Zapata had not entered the house, Zapata gave a statement identifying Henderson as one of the two men that had entered, and Zapata agreed to testify against Henderson and Allen.  However, Mr. Zapata thereafter stated he would invoke the Fifth Amendment and was not called to testify at trial.  Thus, the jury never heard testimony from either Allen or Zapata or any information as to why they were not charged.

5     Petitioner baldly "asserts" that the KCA "relied on an unreasonable view of the facts to find counsel was not ineffective or that counsel's conduct was not prejudicial."  This assertion is nothing more than a conclusory statement.  Mr. Henderson has presented no basis whatsoever for this court to find that the KCA's determination of petitioner's Sixth Amendment claim was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, and none was found during this court's review of the record.

Clause of the Sixth Amendment, citing *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986). They found however that "Henderson's right to confrontation was never in jeopardy in this case" based upon the following reasoning:

> First, the theory behind the right to confrontation is for the accused to have the ability to confront those witnesses adversely testifying against him or her before the jury. . . . The statement in this case only implicates Zapata. The use of the word "us" in the statement implies additional participants, but there was never any examination by either defense counsel or the State as to whom Zapata meant by "us."

*Id.* at *7. In addition, the KCA found that the trial court had "correctly predicted the effect of this evidence after hearing the extent of the statement by Zapata, 'it may be a bunch of nothing when it all comes down to it.'" They thus concluded that there was "no violation of Henderson's constitutional right to confrontation." *Id.*[6]

---

[6]    Petitioner does not argue that this court must consider his confrontation clause claim under one or the other of two possible Supreme Court precedents. Nor did the KCA expressly rely upon either *Ohio v. Roberts, 448 U.S. 56, 66 (1980)* or the "fundamentally different new interpretation of the confrontation right" in *Crawford v. Washington*, 541 U.S. 36 (2004), which overturned *Roberts* but is not "retroactive to cases already final on direct review." *See Littlejohn v. Trammell*, 704 F.3d 817, 844 n. 12 (10th Cir. 2013)(citing *Whorton v. Bockting*, 549 U.S. 406, 409 (2007)). Petitioner's case was not "final on direct review" until September 19, 2006; however, his confrontation claim was decided by the KCA in 2010. This issue need not be determined in this federal habeas corpus proceeding. Instead, it "is enough" to meet the § 2254 threshold that there "*was* clearly established (Supreme Court) law for the (KCA) to apply." *Id.*

## 2. *Federal Habeas Review*

"The Confrontation Clause of the Sixth Amendment provides: 'In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'" *Davis v. Washington*, 547 U.S. 813, 821 (2006). The United States Supreme Court interprets the Clause as barring "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross-examination." *Id. (citing Crawford*, 541 U.S. at 53–54).[7] "A critical portion of this holding . . . is the phrase 'testimonial statements.'" *Id.* "Only statements of this sort cause the declarant to be a 'witness' within the meaning of the Confrontation Clause." *Id.* (The text of the Confrontation Clause reflects that it "applies to 'witnesses' against the accused—-in other words those who "bear testimony.")(*citing Crawford,* 541 U.S. at 51). The Supreme Court has made clear that "[i]t is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." *Davis*, 547 U.S. at 821. The Court in *Crawford* noted that testimonial statements typically

---

7    Following *Crawford* and *Davis*, the *Roberts* standard, which required either a firmly-rooted hearsay exception or particularized guarantees of trustworthiness, is "no longer good law." *See U.S. v. Smalls*, 605 F.3d 765, 773 (10th Cir. 2010)(unpublished).

involve "a solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Crawford*, 541 U.S. at 51. At a minimum, testimonial statements include "prior testimony at a preliminary hearing, before a grand jury, or at a former trial, and a "recorded statement, knowingly given in response to structured police questioning." *Id*. at 53, 68. On the other hand, a person who makes a casual remark that is overheard is generally not making a testimonial statement. *Garrison v. Ortiz*, 296 Fed.Appx. 724, 726 (10th Cir. 2008)(concluding that out-of-court statements made informally to an acquaintance that did not seek to prove facts relevant to a criminal investigation could not be deemed testimonial). Were this court required to consider the character of Zapata's statement, it would agree with the KCA's findings that Mr. Henderson's right to confrontation was "never in jeopardy" and the Confrontation Clause was not violated by its introduction. Zapata's remark was not a testimonial statement.[8] The Supreme Court ruled in *Davis* that the Confrontation Clause does not apply to

---

8    It was "not, even to the slightest degree, a formal declaration" and "thus lacks the formality 'essential to testimonial utterance.'" *Smalls*, 605 F.3d at 779 (*citing Davis*, 547 U.S. at 830-31 n. 5). It certainly was not a solemn declaration or affirmation intended to bear witness against Mr. Henderson and was not made during police interrogation. Nor was it made for the purpose of establishing or proving some fact relevant to Henderson's criminal prosecution. Zapata was not a jointly-tried co-defendant. Zapata's brief lament uttered while he was alone was clearly off-hand. Given that a "casual remark to an acquaintance" is nontestimonial, Zapata's casual remark to himself was surely nontestimonial as well. Significantly, Zapata's utterance did not name or directly implicate petitioner either as being present at the scene or taking part in the crimes.

non-testimonial hearsay statements. *Davis*, 547 U.S. at 821. Furthermore, the fact that defense counsel introduced Zapata's statement rather than the State removes this evidence from the Confrontation Clause realm and, in any event, indicates a waiver by defense counsel.[9]

However, even if Zapata's statement were considered testimonial and as admitted erroneously, Mr. Henderson is "not entitled to habeas relief based on trial error unless [he] can establish that it resulted in 'actual prejudice.'" *Brecht*, 507 U.S. at 623, 637-38; *Littlejohn*, 704 F.3d at 844-45 (*citing Jones v. Gibson*, 206 F.3d 946,

---

[9] In state court, petitioner argued that his defense counsel did not lawfully waive his confrontation rights. He alleged in support that his counsel did not discuss the matter with him and did not obtain his waiver in writing. However, the U.S. Supreme Court has held that a defense counsel's intentional failure to exercise the defendant's confrontation rights can amount to an effective waiver. *See Taylor v. Illinois*, 484 U.S. 400, 417-18 (1988):

> Although there are basic rights that the attorney cannot waive without the fully informed and publicly acknowledged consent of the client, the lawyer has—and must have—full authority to manage the conduct of the trial. The adversary process could not function effectively if every tactical decision required client approval. . . . Putting to one side the exceptional cases in which counsel is ineffective, the client must accept the consequences of the lawyer's decision to forgo cross-examination. . . .

*Id.; see also United States v. Lopez-Medina*, 596 F.3d 716, 732 (10th Cir. 2010)("Although a defendant's right to confront and cross-examine witnesses is fundamental, under certain circumstances, it can be waived by the defendant or through defense counsel."). The Tenth Circuit Court of Appeals has also concluded that a defendant "waives his confrontation right by intentionally opening the door to testimonial evidence." *See id.* (and cases cited therein). Moreover, nowhere in petitioner's allegations or in the record is it indicated that he notified his defense counsel or the trial court that he refused to waive his right to confrontation as to Zapata's statement.

957 (10th Cir. 2000))(citations omitted).  It follows that this court's inquiry is limited to whether or not admission of Zapata's statement was harmless under the *Brecht* standard.  *See Fry*, 551 U.S. at 121; *Welch*, 639 F.3d at 993 ("[W]e review [in the Confrontation Clause context] only whether the admission of the testimony is harmless under the *Brecht* standard.").  This court thus analyzes whether, in the light of the record as a whole, the admission of Zapata's statement had a "substantial and injurious effect or influence in determining the jury's verdict."  *Brecht*, 507 U.S. at 638; *Littlejohn v. Trammell*, 704 F.3d 817, 833 (10th Cir. 2013); *Littlejohn v. Workman*, 704 F.3d at 844 ("Confrontation Clause errors [are] subject to . . . harmless-error analysis.")(*citations omitted*).  The Tenth Circuit explained the factors to be considered in making this inquiry:

> In determining whether error was harmless in this context, we consider factors such as the "importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and . . . the overall strength of the prosecution's case."

*Littlejohn*, 704 F.3d *at 845 (citing Van Arsdall*, 475 U.S. at 684; *accord Jones*, 206 F.3d at 957; *see Wiggins v. Boyette*, 635 F.3d 116, 121–22 (4th Cir. 2011)).

Applying these principles to the facts of this case there can be little doubt that Detective King's testimony regarding Zapata's statement was harmless. First, King's testimony about Zapata's statement was not introduced by the prosecution and was never made part of the prosecution's evidence. The trial court admitted the testimony because defense counsel sought its admission as part of defense strategy. As discussed earlier, trial counsel appeared to have an objectively reasonable strategy for admitting the hearsay testimony, namely to attack Zapata's credibility and to reveal inconsistencies in MB's trial testimony. The prosecutor asked no questions regarding this statement after it was entered and did not rely upon it or even mention it in closing.[10] Thus, the extent of permissible cross-examination was never tested. Zapata's statement was cumulative and corroborated rather than contradicted by trial evidence. It did not include any identification of petitioner. Finally, the prosecutor's case against Mr. Henderson was strong. Petitioner did not suffer prejudice from the admission of Zapata's statement because, as detailed throughout this opinion, the prosecution presented other evidence of petitioner's guilt that was overwhelming. Based on the overwhelming evidence against Mr.

---

10    Zapata was not called to testify at trial and thus did not invoke his Fifth Amendment right to remain silent at petitioner's trial. It is not clear that petitioner had no prior opportunity to examine Zapata about his statement, such as at the preliminary hearing, which is not part of the record.

Henderson and the limited substance and use of Zapata's statement at trial, the court has no difficulty finding that admission of this testimony did not have such effect or influence on the jury's verdict so as to entitle petitioner to federal habeas corpus relief. The court concludes that any possible violation of the Confrontation Clause was harmless. *See U.S. v. Chavez*, 481 F.3d 1274, 1277 (10th Cir. 2007).

## III. Evidentiary Hearing

The court finds no need for an evidentiary hearing as this matter has been resolved on the record. *Anderson v. Attorney Gen. of Kansas*, 425 F.3d 853, 859 (10th Cir. 2005)("[A]n evidentiary hearing is unnecessary if the claim can be resolved on the record.)"; *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing.").

## IV. Certificate of Appealability

Rule 11 of the Rules Governing Section 2254 Proceedings states that the court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. "A certificate of appealability may issue . . . only if the applicant has made a

substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This standard has not been met as to the issues resolved herein, so the court denies a certificate of appealability.

**IT IS THEREFORE ORDERED** that the petition for habeas corpus relief under 28 U.S.C. § 2254 (Dk.1) is denied.

The clerk is directed to substitute Rex Pryor, Warden, Lansing Correctional Facility, as sole respondent.

**IT IS SO ORDERED.**

Dated this 18th day of February, 2014, at Topeka, Kansas.

**s/Sam A. Crow**
**U. S. District Senior Judge**